**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| STACIE K. LANZER OLSON, | ) | CASE NO. 5:25-CV-786 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | JENNIFER DOWDELL ARMSTRONG |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OPINION AND** |
| SECURITY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

## I.      INTRODUCTION

The Commissioner of Social Security[1] denied Plaintiff Stacie K. Lanzer Olson's application for a period of disability, Disability Insurance Benefits (DIB), and Supplemental Security Income (SSI). Ms. Olson[2] seeks judicial review of that decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Compl., ECF No. 1.) The parties have consented to a magistrate judge exercising jurisdiction over the case pursuant to 28 U.S.C. § 636(c), Rule 73 of the Federal Rules of Civil Procedure, and Local Rule 73.1. (Consent and Order, ECF No. 7.)

For the reasons set forth below, the Court AFFIRMS the Commissioner's decision denying Ms. Olson's application for benefits.

## II.      PROCEDURAL HISTORY

In January 2023, Ms. Olson applied to the Social Security Administration (SSA) seeking DIB and SSI.[3] (Tr. 244, 247–48, 256.) She claimed that she became disabled on October 31, 2019.

---

[1] Leland Dudek was serving as Acting Commissioner of Social Security when the complaint was filed. He served in that role until May 2025, when Frank Bisignano, the current Commissioner, was confirmed.

[2] Ms. Olson testified that she has no preference between being called "Ms. Lanzer," "Ms. Olson," or "Ms. Lanzer-Olson." (Tr. 66.) The Court will therefore use "Ms. Olson," as opposed to her hyphenated name, for readability.

[3] The administrative transcript appears at ECF No. 6. I will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 57"). I will

(*Id.*) She identified six allegedly disabling conditions: (1) fibromyalgia; (2) migraines; (3) "recovering alcoholic," (4) major depressive disorder, "severe"; (5) unspecified anxiety disorder; and (6) attention-deficit/hyperactivity disorder. (Tr. 274.)

The SSA denied Ms. Olson's application initially and upon reconsideration. (Tr. 116, 126–27, 134, 145.) Ms. Olson requested a hearing before an administrative law judge (ALJ). (Tr. 172.) The ALJ held a hearing on January 17, 2024, at which Ms. Olson was represented by counsel. (Tr. 64–106.) Ms. Olson testified, as did an independent vocational expert. (*Id.*)

On March 4, 2024, the ALJ issued a written decision finding that Ms. Olson is not disabled. (Tr. 18–58.)

Ms. Olson requested review of the ALJ's decision. (Tr. 242–43.)

On February 25, 2025, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On April 18, 2025, Ms. Olson filed her Complaint, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Olson asserts the following four assignments of error for review:

> **First Assignment of Error:** The ALJ erred at Step Three of the sequential evaluation when he failed to find that Plaintiff satisfied the criteria of Listing 1.16.
>
> **Second Assignment of Error:** The ALJ erred at Step Three of the sequential evaluation when he failed to properly evaluate Plaintiff's headaches and find that she equaled Listing 11.02B.
>
> **Third Assignment of Error:** The ALJ erred when he failed to support and/or address consistency with his conclusions regarding the opinions of the treating sources.

---

refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 9") and page-identification numbers (e.g., "PageID# 1164").

**Fourth Assignment of Error:** The ALJ erred in that his finding at Step Five of the sequential evaluation was contrary to the testimony of the vocational expert.

(Pl.'s Merit Br. at 10, 14, 17, 22, ECF No. 9, PageID# 1164, 1168, 1171, 1176.)

## III. BACKGROUND

### A. Personal, Educational, and Vocational Experience

Ms. Olson was born in February 1986 and was 37 years old on the date of her application. (*E.g.*, Tr. 73, 247.) She graduated high school and has a college degree in administrative office management. (Tr. 74.) She previously worked in the administrative office of a plumbing company, performing human resource and payroll functions, reviewing contracts, and doing other administrative work. (Tr. 75.) Before that, she worked for several months for an energy company, doing data entry and performing other administrative work. (Tr. 76.) She also has experience performing administrative tasks through a staffing agency, selling real estate, and working as a convenience-store cashier. (Tr. 77–81.) Ms. Olson lives with her husband and a daughter. (Tr. 73.) Ms. Olson has a driver's license. (Tr. 74.)

### B. Function Reports

Ms. Olson completed a function report on February 23, 2023. (Tr. 283–90.) She wrote that her fibromyalgia caused a consistent pain in her neck, shoulder, and back; the pain can be severe enough that she has difficulty moving her head, sitting, standing, typing, or concentrating. (Tr. 283.) She also has chronic migraines, which cause her to be sensitive to light and sound; she has headaches "almost daily." (*Id.*) Changes in the weather cause her increased pain, especially when cold or rainy. (Tr. 286.)

With respect to her ADHD, Ms. Olson described that her "mind spins" and said she has a short attention span. (Tr. 283.) Her medicine only helps for about six hours. (*Id.*) She wrote that she has anxiety and panic attacks, which are exacerbated by going to new places or interacting

with new people. (*Id.*) Ms. Olson also complained of depression, describing a lack of motivation and feelings of low self-worth. (*Id.*)

Ms. Olson said that on an average day, she will wake her daughter up for school and then lie on the couch till around 11 a.m. (Tr. 284.) She will eat and take her medicine around 11 a.m. before lying back down until 2 p.m. (*Id.*) In the afternoon she will "try to motivate," brushing her teeth and taking care of appointments or other needs. (*Id.*) She then rests until 7 p.m., when she eats and takes more medicine. (*Id.*) She is in bed by 9 p.m. every night. (*Id.*)

Ms. Olson is able to make sure that her daughter is awake for school every day. (*Id.*) Ms. Olson lets the dog outside. (*Id.*) But her daughter otherwise takes care of the dog, including feeding it and taking it for walks. (*Id.*)

Ms. Olson needs help with some of her clothing, washing her hair, and cutting food. (*Id.*) She only showers when "necessary" because showering is difficult. (*Id.*)

Ms. Olson is able to prepare microwave meals a few days a week. (Tr. 285.) She does laundry—sorting, washing, drying, and folding—but she cannot carry the laundry baskets. (*Id.*)

Ms. Olson drives occasionally, but she only goes to familiar places because she has severe anxiety about getting lost. (Tr. 286.) Sometimes it is too painful to drive. (*Id.*) She shops online, placing orders around two times per month. (*Id.*) She has no trouble handling money. (*Id.*)

Ms. Olson talks to her family on the phone and through text messaging. (Tr. 287.) She is otherwise isolated; she described that she has "minimal contact" with others and "no longer [does] much of anything." (*Id.*)

Ms. Olson estimated that she can walk "about a block" before needing to rest for about 10 minutes. (Tr. 288.) She can pay attention for up to 15 minutes before her "brain starts to spin."

(*Id.*) She can follow basic instructions but has trouble with more complicated ones. (*Id.*) She does not handle stress or changes to her routine well. (Tr. 289.)

Ms. Olson indicated that she does not use crutches, a cane, a walker, or a wheelchair. (*Id.*)

She wrote that her pain diminishes her ability to live a fulfilling life. (Tr. 290.) At times she is not even able to lift a coffee pot. (*Id.*) Her attention is too short to even watch television. (*Id.*) She said that filling out the function report took her "days" and required frequent breaks. (*Id.*)

Mark Olson—Ms. Olson's husband—completed a function report on January 4, 2024. (Tr. 334–43.) He described that Ms. Olson's depression had worsened over the past five years, reaching the point that it is difficult for her to do many things. (Tr. 335.) Ms. Olson has trouble concentrating and "never seems to get any one task finished." (*Id.*) Mr. Olson helps her throughout the day. (*Id.*) Ms. Olson spends most of her time on the couch, either napping or laying "with her face covered." (*Id.*) Mr. Olson described that Ms. Olson's pain limits her ability to use her neck and shoulder; she cannot "sit still for any length of time" and has difficulty walking long distances. (*Id.*) She uses a shower chair and needs help washing her hair. (*Id.*)

Mr. Olson said that Ms. Olson used to have a social circle, and she used to enjoy gardening. (Tr. 336.) He said she can no longer garden and now has little to no interest in talking to or getting together with friends. (*Id.*) She barely speaks to her family. (*Id.*) She has trouble falling asleep and staying asleep. (*Id.*)

Mr. Olson has to help Ms. Olson with any item of clothing that goes over the head, and he has to help her put on her shoes. (*Id.*) He prepares her meals and cuts her food into bite-sized pieces for her. (*Id.*) When Ms. Olson does laundry, it tends to take "almost a full day." (Tr. 337.) She is not able to perform outside chores. (*Id.*)

Ms. Olson usually only leaves the house to attend doctors' appointments, although she also attends a weekly sobriety support group. (Tr. 338–39.) She is able to drive, but she rarely does so due to her anxiety and the pain in her neck. (*Id.*)

Ms. Olson experiences pain even carrying a bag or purse. (Tr. 340.) Mr. Olson described that Ms. Olson uses a "walker," which allows her to walk for about a block before needing to rest. (*Id.*) Mr. Olson stated a doctor prescribed Ms. Olson a cane in 2023, and she transitioned to a walker towards the middle of that year. (*Id.*)

Mr. Olson wrote that Ms. Olson has panic attacks several times a week, during which it can take between 30 minutes and 2 hours to calm down. (Tr. 342.)

### C.  **Relevant Hearing Testimony**

#### 1.  *Ms. Olson's Testimony*

Ms. Olson testified that most of her back pain comes from her neck and shoulder, although she does have "some problems" with her lower back. (Tr. 82.) She said that her lower back pain is a constant dull, manageable pain, but some days the pain can be a little worse. (*Id.*) The pain does not radiate. (Tr. 83.) She has done physical therapy for years with respect to her lower back, and she performs stretches. (*Id.*)

Her upper back pain frequently causes numbness and tingling that radiates into her shoulder blades and—on the right side—down her right arm to her index finger and thumb. (Tr. 84.) The numbness lasts for a minute or two before going away and then returning multiple times a day. (Tr. 85.) When this numbness is present, she has difficulty grasping things. (*Id.*) Occasionally this numbness turns into pain. (Tr. 84.) Ms. Olson testified that she cannot write for longer than ten minutes before experiencing discomfort that requires her to rest for at least 30 minutes; she said that typing is "extremely difficult." (Tr. 85.) She has difficulty operating zippers, buttons, and snaps. (*Id.*)

Ms. Olson testified that this numbness or pain can also radiate from the base of her skull to the front of her head, usually an indication that a migraine headache could be coming. (Tr. 84.) She has migraines around twice per week; they last for between six and ten hours. (Tr. 86.) Her migraines make her nauseous and cause her to be sensitive to light, sound, and movement. (*Id.*) She finds that she has to lie down in the dark, "otherwise it's unbearable." (*Id.*) She takes an injection of ondansetron once a month, which has reduced the frequency of her migraines from three or four times a week. (*Id.*) She has another migraine medicine that she can take as needed, but it causes her to feel dizzy and disoriented. (Tr. 86–87.)

Ms. Olson has been diagnosed with fibromyalgia. (Tr. 87.) Her fibromyalgia pain primarily presents in her shoulder and neck, but she can get pain "pretty much anywhere" depending on her exertion. (*Id.*)

Ms. Olson uses a rolling walker anytime she goes out. (Tr. 87–88.) Her doctor prescribed her the walker six months before the hearing; the doctor had previously prescribed a cane in 2003. (Tr. 88.) With the rolling walker, Ms. Olson is able to walk about a city block before needing to rest for around 15 minutes. (Tr. 87–88.)

Ms. Olson is able to sit, but she finds herself "constantly" repositioning and often needs to get up and stretch. (Tr. 88.) She is not able to lift even five-pound objects with her right arm. (*Id.*)

Ms. Olson testified that once or twice a week, it feels like her right foot "disappears" for between 30 seconds and two minutes. (Tr. 89.)

Ms. Olson also described mental health symptoms. She has "many days" where she does not have the energy or motivation to get herself up from bed and moving. (Tr. 90.) She has trouble concentrating, to the point that she cannot even focus on television programs. (*Id.*) She tries not to "deal with" other people and has broken off relationships with friends and family. (*Id.*) She finds

that she is able to relate reasonably well to doctors and others when interaction is required. (*Id.*) She has several panic attacks each week. (*Id.*)

Ms. Olson testified that she has seen the same mental health provider for a number of years and recently started treating with a therapist as well. (Tr. 90–91.) She takes alprazolam (Xanax), lisdexamfetamine dimesylate (Vyvanse), and duloxetine (Cymbalta) for her mental health symptoms. (Tr. 91.) She generally finds that her medication is helpful, although the Vyvanse does not last as long as she wants. (*Id.*)

Ms. Olson said she has trouble sleeping. (Tr. 91.) She has been sleeping on a couch for almost a year because she finds it hard to navigate downstairs from the bedroom to the restroom at night. (*Id.*) She finds that she is only able to sleep for an hour to 90 minutes at a time, after which she is awake for about an hour before falling back to sleep. (Tr. 91–92.) She takes many naps throughout the day. (Tr. 92.)

Ms. Olson testified that she only showers when she has a doctor's appointment because showering is "extremely painful." (Tr. 92.) She said that showering is "degrading" because she needs her husband's help. (*Id.*) She generally stays in her pajamas throughout the day and needs help getting dressed because she cannot lift her arms over her shoulders or "pull anything down with any kind of strength." (*Id.*) She has difficulty bending over and putting shoes on. (*Id.*)

Ms. Olson is able to fold laundry. (*Id.*) She pays bills online. (*Id.*) She tries to pick up after herself but cannot vacuum. (*Id.*) Her daughter helps a lot with chores. (*Id.*)

Ms. Olson said she does not usually drive or go to the store; she has "incredible anxiety" driving and has difficulty getting her walker from the car. (Tr. 93.) Her husband usually does the shopping. (*Id.*) Ms. Olson has no social activity except attending a sobriety support group once a week. (*Id.*)

On a typical day, Ms. Olson wakes up at 10:00 a.m. and stays on the couch until 11:00 or 11:30 a.m. (Tr. 93–94.) Her husband will then feed her, after which she will take medicine and then lie down for a couple hours. (Tr. 94.) Her best hours of the day are in the mid-afternoon, during which time she considers taking a shower or figuring out something else to do; at times she will grow anxious and frustrated with trying to do something and will not do anything at all. (*Id.*) She is usually back on the couch by 6:30 p.m., after which she will eat dinner and then try to go to sleep by 9:00 p.m. (*Id.*)

In response to questions from her counsel, Ms. Olson testified that she has "bad days" three to five days per week when it comes to her mental symptoms. (*Id.*) Every day is a "bad day" in terms of physical pain. (*Id.*) She often finds herself isolated and feels that, in a work environment, she could not work around others. (Tr. 95.) Her sleep problems compound her physical and mental symptoms. (Tr. 95–96.) She used to be an avid camper, and she used to enjoy fishing, hiking, and collecting rocks; she does not do any of those things anymore. (Tr. 96–97.) She used to be able to garden, but she cannot bend over to weed or work on other do-it-yourself projects. (Tr. 97.)

Ms. Olson wears incontinence pads when she leaves the house due to involuntary bowel issues. (Tr. 105.)

### 2. *Vocational Expert's Testimony*

Deborah Lee testified as a vocational expert (VE) at the hearing. (Tr. 98.) The VE classified Ms. Olson's past work as that of an administrative clerk (DOT 219.362-010), an apartment-house manager (DOT 186.167-018), and a cashier II (DOT 211.462.010). (Tr. 99.)

The ALJ asked the VE to assume that a hypothetical individual with Ms. Olson's age and education is capable of sedentary work with certain exertional and non-exertional limitations. (Tr. 99–100.) The hypothetical person could frequently handle and finger; could occasionally climb ramps and stairs; would never climb ladders, ropes, or scaffolds; could occasionally balance,

stoop, kneel, crouch, or crawl; could frequently reach in all directions; and would never be exposed to unprotected heights, hazardous machinery, or commercial driving. (Tr. 100.) The person would further be limited to the performance of routine tasks and simple, work-related decisions. (*Id.*) The person would be limited to occasional interaction with supervisors, coworkers, and the general public. (*Id.*) And the person would be limited to only few changes in a routine work setting. (*Id.*)

The VE testified that such a person would not be able to perform Ms. Olson's past relevant work but could further perform the work of a production worker (DOT 713.687-018), sorter (DOT 521.687-086), or document preparer (DOT 249.587-018). (Tr. 100–01.)

The ALJ next asked the VE to assume that the hypothetical person would be further limited in that they would require a rolling walker when standing or ambulating. (Tr. 101) The VE testified that such a person could perform the work of a surveillance-system monitor (DOT 379.367.010) or an addresser (DOT 209.587-018). (Tr. 101–02.)

The ALJ next asked the VE to assume that the hypothetical person would be further limited to only occasional reaching, handling, or fingering. (Tr. 102.) The VE testified that there were no jobs available to such a person. (*Id.*)

The VE similarly testified that no work would be available to a person who could frequently reach, handle, and finger, but who could have no interactions with coworkers or the general public. (Tr. 102.)

Finally, the VE testified that a person who is off-task for 20 percent or more of the workday and absent more than three days per month would not be able to sustain competitive employment. (Tr. 102–03.)

### D.    <u>State Agency Consultants</u>

A disability examiner (Madison Scanlan), a physician (Mehr Siddiqui, M.D.) and a psychologist (Audrey Todd, Ph.D.) reviewed Ms. Olson's claim at the initial review level. (Tr. 107–15.)

Dr. Todd opined that Ms. Olson had moderate limitations with respect to her ability to maintain attention and concentration for extended periods and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace. (Tr. 112.) Dr. Todd wrote that Ms. Olson would be capable of carrying out "repetitive, short-cycle, 1–3 step tasks" and making simple decisions "without a fast-paced demand where [she] can work away from others." (Tr. 113.) Dr. Todd found that Ms. Olson was moderately limited in her ability to interact appropriately with the general public and to accept instructions and respond appropriately to criticism from supervisors. (*Id.*) Dr. Todd explained that Ms. Olson "can relate to coworkers and supervisors on a superficial level" and "can have occasional superficial interactions with the general public" but should not have responsibility for conducting any business with the public. (*Id.*) Dr. Todd further found that Ms. Olson had a moderate limitation with respect to her ability to respond appropriately to changes in the work setting, writing that Ms. Olson remained capable of dealing with "occasional changes in routine" but would "require a low stress, consistent setting" with clear performance expectations and "relatively static duties." (*Id.*)

Dr. Siddiqui opined that the medical evidence showed that Ms. Olson has fibromyalgia but "with treatment, [the] symptoms appear to be improving." (Tr. 122.) Dr. Siddiqui wrote that Ms. Olson could stand or walk for six hours in a normal workday and could sit for six hours. (*Id.*) She is capable of frequently climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. (*Id.*) She can only occasionally climb ladders, ropes, or scaffolds. (*Id.*) She may not

11

operate heavy machinery or drive commercially, and she should avoid all exposure to unprotected heights. (Tr. 123.)

Based on these opinions, the state agency consultants found that Ms. Olson was capable of performing the work of a "pager" (DOT 654.687-014), "addresser" (DOT 209.587-010), or "stuffer" (DOT 731.685-014) and was not disabled. (Tr. 125–26.)

In a letter explaining this decision to Ms. Olson, the SSA wrote that the evidence showed that she is "able to stand, walk, and move about in a satisfactory manner," "understand and remember instructions, interact appropriately with others, tolerate the pressure of routine tasks, and care for [her] basic needs." (Tr. 155.)

A disability examiner (Sarah Farrow), a physician (Elizabeth Das, M.D.), and a psychologist (Courtney Zeune, Psy.D.) reviewed Ms. Olson's claim at the reconsideration level. (Tr. 128–35.)

Dr. Das and Dr. Zeune affirmed that the prior administrative findings "continue to be supported and consistent" with the record evidence. (Tr. 130, 133, 140, 142.)

Based on these opinions, the consultants determined that Ms. Olson was limited to unskilled work but could perform the work of a "cleaner, housekeeping, light" (DOT 323.687-014), "bagger" (DOT 920.687-018), or "order caller" (DOT 209.667-014). (Tr. 143.) They found that she was not disabled. (Tr. 135, 144.)

In a letter explaining this decision to Ms. Olson, the agency wrote that she "may have had difficulty with complex tasks" but was "able to understand and complete one and two step instructions" and "did not require special supervision while working." (Tr. 167.) The agency further stated that Ms. Olson was able to "move about adequately" and maintained "good strength

and range of motion," such that she could "do light lifting." (Tr. 171.) The agency further wrote that there was "no significant limitation in [her] ability to sit, stand and/or walk." (*Id.*)

### E.    Relevant Medical Evidence

Ms. Olson underwent psychiatric treatment at least as early as October 2019, complaining of severe depression, anxiety, and panic attacks. (*See* Tr. 351.) Treatment notes reflect that Ms. Olson "is able to focus and concentrate during the day" while on medication. (*Id.*; *see also* Tr. 355.) Notes also reflect that Ms. Olson complained of headaches. (*E.g.*, Tr. 352, 356.)

By February 2020, Ms. Olson had made "some progress," reporting an improved mood and less depression and anxiety. (Tr. 358.) She continued to complain of headaches. (Tr. 359.)

The outbreak of COVID-19 caused Ms. Olson to feel more anxious, and she described her mood as "moderately depressed" in April 2020. (Tr. 361.) She described herself as "mildly depressed" in June 2020, but she said her anxiety was severe. (Tr. 364.) The psychiatric nurse practitioner again noted that Ms. Olson is able to focus and concentrate during the day. (*Id.*)

Ms. Olson's status was largely the same at her appointment in July 2020, although she noted that new medicine had not been helpful for her. (Tr. 367.) After starting on lurasidone, though, Ms. Olson showed improvement. (Tr. 370.) At her August 2020 appointment, she reported a stable, although moderately depressed mood and moderate anxiety. (*Id.*) She was continued on the same medication regimen without changes. (Tr. 372.) By October 2020, she reported mild depression and moderate anxiety. (Tr. 373.) Her condition remained largely unchanged through February 2021. (Tr. 376.)

In April and May 2021, Ms. Olson's mood was described as "stable and euthymic." (Tr. 382, 385.) She was again "mildly depressed" with moderate anxiety in July 2021. (Tr. 388.)

By November 2021, Ms. Olson's mood was listed as stable and euthymic, although she continued to suffer from moderate anxiety and bouts of mild depression. (Tr. 446, 450.) That

condition remained unchanged through January 2022, when she was reportedly "doing well." (Tr. 444.)

In May 2022, Ms. Olson complained that she was having issues with focus and concentration. (Tr. 437.)

Ms. Olson underwent a diagnostic assessment on June 30, 2022. (Tr. 418.) She described feeling depressed for the past year, where she has felt "no interest in anything" and felt that she is "no good for anybody." (Tr. 424.) She rated her symptoms as an eight on a scale of one to ten. (*Id.*) She also said that she had "awful" anxiety—rated a nine out of ten—and described worrying, racing thoughts, rumination, intrusive thoughts, and hypervigilance. (*Id.*) She said it can "sometimes" be hard for her to focus and concentrate. (*Id.*)

Ms. Olson began treating with a counselor in July 2022. (Tr. 391, 397, 400, 403, 406, 409, 412, 415.)

At an appointment with her psychiatric nurse practitioner in December 2022, Ms. Olson reported feeling more depressed, which she tied to a family stressor. (Tr. 453.)

At a counseling appointment on November 16, 2023, Ms. Olson was noted to be in pain and slightly unsteady on her feet. (Tr. 686.) She was walking with a cane. (*Id.*) She continued to struggle with grief, anxiety, and depression. (Tr. 686–87.)

Ms. Olson's psychiatric nurse practitioner—Robert Parsons—completed a Mental Impairment Questionnaire in December 2023. (Tr. 563–64). Mr. Parsons identified that Ms. Olson has severe depression, significant baseline anxiety, and poor focus and concentration. (Tr. 563.) He opined that her prognosis was "fair." (*Id.*) He further noted that Ms. Olson had "no useful ability to function" in a number of areas, including working in coordination with or in proximity to others, performing at a consistent pace, and completing a normal workday and workweek

without interruptions from psychologically based symptoms. (Tr. 563.) He found that she would be unable to meet competitive standards in a number of additional areas, including remembering locations and work-like procedures, interacting with the general public, responding appropriately to changes in the work setting, and managing regular attendance. (Tr. 563–64.) Mr. Parsons opined that he expected Ms. Olson to be off-task for 20 minutes out of every hour and to be absent one to three days per month. (Tr. 565.)

Ms. Olson began treating with Jefferie Wilhelm, a pain management nurse practitioner, on January 24, 2023. (Tr. 466.) She complained of neck pain and low back pain for eight years that had been recently worsening. (*Id.*) She described an aching pain in her low back and a sharp pain in her neck that radiated into her shoulders and upper extremities. (*Id.*) The pain is made worse by lifting, getting up from sitting, and walking. (*Id.*) It is improved by lying down and applying heat. (*Id.*) She said she had previously seen some improvement with physical therapy, but "she has not done physical therapy for years." (*Id.*)

On examination, Ms. Olson displayed "significant muscular tenderness and tightness upon palpation," although she had full strength in her upper and lower extremities. (Tr. 468–69.) She had decreased range of motion in her neck and lumbar spine. (Tr. 469.) Ms. Olson was referred for physical therapy and imaging. (*Id.*; *see also* Tr. 472–79, 555–56, 1030–50.)

Ms. Olson consulted with Nicholas Turgeon, D.O., on February 13, 2023. (Tr. 488) She complained of abdominal pain, nausea, and diarrhea. (Tr. 489.) She rated the pain in her neck, shoulders, and back as a ten on a scale of one to ten. (*Id.*) She denied feeling stress and said that her anxiety medication "keeps her ok." (*Id.*) Her physical examination was normal, with full range of motion. (Tr. 489–90.)

Ms. Olson next saw Dr. Turgeon on March 9, 2023. (Tr. 1059.) Ms. Olson complained of a migraine headache, describing a pain in the back of her neck that led to a feeling that her "brain" was "filling up." (Tr. 1060.) Dr. Turgeon noted that Ms. Olson had discontinued her migraine medicine because she felt it was losing efficacy, after which her migraines had worsened. (*Id.*) Her physical examination was unremarkable. (Tr. 1061–62.)

Ms. Olson underwent an MRI of the cervical spine on April 21, 2023. (Tr. 970.) The imaging revealed certain degenerative changes, including (1) facet arthropathy with moderate right foraminal stenosis at the C3–C4 level; (2) at the C4–C5 level, disk osteophyte complex, facet, and uncinate joint hypertrophy resulting in mild flattening of the ventral cord and moderate right foraminal stenosis; and (3) at the C5–C6 level, minimal disc osteophyte formation without canal or foraminal stenosis. (Tr. 971.)

Ms. Olson followed up with Dr. Turgeon on May 22, 2023. (Tr. 1055.) She described continued gastrointestinal symptoms and complained of numbness along her right upper arm. (*Id.*) She said that she had been having trouble with her memory as well; she described that she forgets where she parked her car and forgets "something someone told her 1 min[ute] ago." (Tr. 1056.) Her physical examination was unremarkable. (*Id.*)

Physical therapy notes reflect some improvement in Ms. Olson's pain over time; by May 2023, she said that her neck pain was "still not 100%" but she felt that the exercises had been helpful. (Tr. 1030.)

Ms. Olson followed up with her pain management nurse practitioner on November 14, 2023. (Tr. 822.) She reported that her neck pain was a nine on a scale of ten. (*Id.*) She said that she was using a wheeled walker to ambulate. (*Id.*) She complained that an epidural injection in August 2023 had not improved her symptoms at all. (*Id.*)

16

Ms. Olson underwent a lumbar MRI in August 2023. (Tr. 924.) The MRI was largely unremarkable, although it revealed "mild tortuosity of the cauda equina nerve roots at L5–S1 with slight peripheralization[,] which could reflect an underlying arachnoid cyst or loculation, or potentially sequelae of remote arachnoiditis." (Tr. 925.) There was also an "[i]ncidental small dorsally projecting synovial facet cyst at L4–L5 and on the left. (*Id.*)

Ms. Olson told her pain management nurse practitioner that she discussed these results with a neurosurgeon, who told her that there was "nothing concerning" on the MRI. (Tr. 870.) But she reported continued pain and intermittent numbness in the right foot that had caused her to fall. (Tr. 905.) She said that she was using a cane to ambulate. (*Id.*)

When she followed up in October 2023, she said she was using a wheeled walker. (Tr. 870.) But electromyography testing related to the foot numbness revealed no abnormalities. (*Id.*)

On November 21, 2023, Dr. Turgeon completed a medical source statement regarding Ms. Olson's headaches. (Tr. 1118–21.) Dr. Turgeon identified that Ms. Olson experiences two migraine headaches per week, each one lasting for eight hours. (Tr. 1118.) He wrote that the headaches begin at the base of the posterior skull and identified that the headaches are accompanied by a number of other symptoms, including vertigo, nausea, photophobia, phonophobia, visual disturbances, and mental confusion. (*Id.*) Dr. Turgeon opined that Ms. Olson is not capable of even low stress work, because she is unable to move her body, turn her head, or concentrate. (Tr. 1119.) He wrote that the headaches were made worse by bright lights, noise, stress, movement, and weather changes. (*Id.*) Dr. Turgeon opined that Ms. Olson can be expected to be off-task for 25 percent or more of the work day and be absent around four days per month. (*Id.*) He identified her prognosis as "poor." (Tr. 1120.)

Ms. Olson consulted with Ryan Drake, D.O., on November 30, 2023. (Tr. 565.) She complained of twice weekly migraines, confusion, stress, anxiety, and depression. (Tr. 568.) Dr. Drake opined that her upper extremity pain "is most likely some degree of cervical radiculopathy." (Tr. 569.)

Dr. Turgeon completed a medical source statement regarding Ms. Olson's spine on December 5, 2023. (Tr. 1122–25.) Dr. Turgeon noted that Ms. Olson had been diagnosed with degenerative changes in the spine that are most severe at the C4–C5 level. (Tr. 1122.) To support that diagnosis, Dr. Turgeon pointed to Ms. Olson's cervical spine MRI. (*Id.*) He noted that the condition causes pain and weakness, including severe pain in the head and neck. (*Id.*) He identified that Ms. Olson had decreased axial cervical range of motion and displayed tenderness and muscle weakness on examination. (Tr. 1123.) He opined that Ms. Olson could sit for at least six hours at a time but could only stand for 10 minutes and walk one city block. (*Id.*) He wrote that Ms. Olson would need to walk around for five minutes every hour and can be expected to need one unscheduled break every other day for an hour. (Tr. 1124.) He limited Ms. Olson to frequently lifting items up to 10 pounds, occasionally up to 20 pounds, but never items weighing 50 pounds. (*Id.*) He further limited her rarely twisting, stooping, and squatting, and to frequently climbing stairs. (*Id.*) He again opined that Ms. Olson would be off-task, this time for 15% of the workday, and would be absent more than four days per month. (Tr. 1125.)

On the same day, Dr. Turgeon filled out another medical source statement. (Tr. 1126–29.) He opined that Ms. Olson required a cane or other hand-held assistive device for both standing and walking, although he wrote that she does not need the device all the time. (Tr. 1128.)

## IV.    THE ALJ'S DECISION

The ALJ found that Ms. Olson met the insured-status requirements of the Social Security Act through September 30, 2021. (Tr. 23.) The ALJ further determined that she had not engaged

in substantial gainful activity since October 31, 2019, the alleged onset date. (Tr. 24.)

The ALJ next determined that Ms. Olson has had the following severe impairments since October 31, 2019: (1) major depressive disorder, (2) generalized anxiety disorder, and (3) attention-deficit/hyperactivity disorder (ADHD). (*Id.*) The ALJ found that beginning on January 5, 2023, the date the SSI application was filed, Ms. Olson has had the following additional severe impairments: (4) degenerative disc disease (DDD) of the cervical spine with radiculopathy, (5) tortuosity of the cauda equina nerve roots at the lumbosacral junction, (6) pancreatic insufficiency, (7) fibromyalgia, and (8) migraines. (*Id.*)

The ALJ then concluded that none of Ms. Olson's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 26.)

The ALJ determined that Ms. Olson had the residual functional capacity ("RFC") through September 30, 2021, to perform a full range of work at all exertional levels with several non-exertional limitations. (Tr. 30.) Specifically, she could perform only simple, routine tasks and could make only simple work-related decisions; she could have occasional interactions with supervisors, with coworkers, and with the general public; and she could tolerate few changes in a routine work setting. (*Id.*)

The ALJ found that Ms. Olson's RFC diminished as of January 5, 2023. (Tr. 38.) From that date onward, she was capable of sedentary work (as defined in 20 CFR 416.967(a)), except that she requires a rollator walker for ambulation. (*Id.*) She can never climb ladders, ropes, or scaffolds but can occasionally climb ramps and stairs. (*Id.*) She can occasionally balance, stoop, kneel, crouch, and crawl. She can frequently reach in all directions, handle, and finger. (*Id.*) She can never be exposed to unprotected heights, hazardous machinery, or commercial driving. (*Id.*)

19

She can perform only simple, routine tasks and can make only simple work-related decisions; can have occasional interactions with supervisors, with coworkers, and with the general public; and can tolerate few changes in a routine work setting. (*Id.*)

The ALJ concluded that Ms. Olson was unable to perform her past relevant work as an administrative clerk, apartment house manager, or cashier II. (Tr. 54.) He further found that she had a high school education and was 33 years old on the date of her disability application. (*Id.*)

The ALJ then determined that—considering Ms. Olson's age, education, work experience, and RFC—there were jobs that existed in significant numbers in the national economy that she could perform through September 30, 2021, including work as a "document preparer" (DOT 249.587-018), "final assembler" (DOT 713.687-018), or "sorter" (DOT 521.687-086).[4] (Tr. 55.)

Accordingly, the ALJ concluded that Ms. Olson was not disabled at any time through September 30, 2021. (Tr. 56.)

Turning to the period beginning on January 5, 2023, the ALJ again found that there were jobs that existed in significant numbers in the national economy that Ms. Olson could perform, including work as a "document preparer," "surveillance system monitor" (DOT 379.367-010), and "addresser" (DOT 209.587-010). (Tr. 56–57.)

Accordingly, the ALJ concluded that Ms. Olson was not disabled at any time after January 5, 2023. (Tr. 57.)

---

[4] These jobs refer to entries in the U.S. Department of Labor's *Dictionary of Occupational Titles*. The DOL no longer publishes the tool—*see Browning v. Colvin*, 766 F.3d 702, 709 (7th Cir. 2014)—but the most recent version, from 1991, is available online through the DOL's Office of Administrative Law Judges Law Library. *Dictionary of Occupational Titles—Fourth Edition, Revised 1991*, U.S. DEPT. OF LABOR OFF. OF ADMIN. L. JUDGES, https://www.dol.gov/agencies/oalj/topics/libraries/LIBDOT.

## V.      LAW & ANALYSIS

### A.      <u>Standard of Review</u>

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.

2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

    **B.**    <u>**Standard for Disability**</u>

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

    **C.**    <u>**Analysis**</u>

       *1.*    *First Assignment of Error – Listing 1.16*

In her first assignment of error, Ms. Olson contends that the ALJ erred at Step Three of the sequential analysis when he found that she did not meet or medically equal Listing 1.16. She challenges the ALJ's conclusion that Ms. Olson's functional limitations did not meet the durational criteria of the listing, arguing that "[t]he progression from a cane to a rollator/walker demonstrated a deterioration in her condition" such that "supposing that she would no longer need the rollator within a few months of the hearing was an incredulous supposition and was contrary to the medical evidence . . . ." (Pl.'s Merits Br. at 10, ECF No. 9, PageID# 1164.)

Ms. Olson then points to numerous instances in the record where she complained of back and neck pain, directs the Court to her testimony that she required a cane and then a walker, and emphasizes that spinal imaging revealed some abnormal findings that support her statements about her symptoms and functional limitations. (*Id.* at 10–12, PageID# 1164–66.)

The Commissioner defends the ALJ's decision, arguing that there were no supportive medical opinion findings from a state agency consultant or another medical expert here, that the MRI imaging actually revealed that there was no spinal stenosis, and that there is no documented medical need for Ms. Olson to use a cane or walker.

After careful consideration, the Court agrees that substantial evidence supports the ALJ's conclusion that Ms. Olson does not meet the Listing 1.16 criteria.

"The Listing of Impairments . . . describes impairments the SSA considers to be 'severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.' " *Reynolds v Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (quoting 20 C.F.R. § 404.1525(a)). "Each listing specifies 'the objective medical and other findings needed to satisfy the criteria of that listing' " and "[a] claimant must satisfy all of the criteria to 'meet' the listing." *Id.* (quoting 20 C.F.R. § 404.1524(c)(3)). "[T]he claimant must point to specific evidence that demonstrates [she] reasonably could meet or equal every requirement of the listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014).

Listing 1.16 requires a claimant to establish the following:

> Lumbar spinal stenosis resulting in compromise of the cauda equina (see 1.00G), documented by A, B, C, and D:
>
> A.  Symptom(s) of neurological compromise manifested as:
>
> 1.   Nonradicular distribution of pain in one or both lower extremities; or

24

2.     Nonradicular distribution of sensory loss in one or both lower extremities; or

3.     Neurogenic claudication.

AND

B. Nonradicular neurological signs present during physical examination (see 1.00C2) or on a diagnostic test (see 1.00C3) and evidenced by 1 and either 2 or 3:

1.     Muscle weakness.

2.     Sensory changes evidenced by:

    a.     Decreased sensation; or

    b.     Sensory nerve deficit (abnormal sensory nerve latency) on electrodiagnostic testing; or

    c.     Areflexia, trophic ulceration, or bladder or bowel incontinence.

3.     Decreased deep tendon reflexes in one or both lower extremities.

AND

C. Findings on imaging (see 1.00C3) or in an operative report (see 1.00C4) consistent with compromise of the cauda equina with lumbar spinal stenosis.

AND

D. Impairment-related physical limitation of musculoskeletal functioning that has lasted, or is expected to last, for a continuous period of at least 12 months, and medical documentation of at least one of the following:

1.     A documented medical need (see 1.00C6a) for a walker, bilateral canes, or bilateral crutches (see 1.00C6d) or a wheeled and seated mobility device involving the use of both hands (see 1.00C6e(i)); or

2.     An inability to use one upper extremity to independently initiate, sustain, and complete work-related activities

25

> involving fine and gross movements (see 1.00E4), and a documented medical need (see 1.00C6a) for a one-handed, hand-held assistive device (see 1.00C6d) that requires the use of the other upper extremity or a wheeled and seated mobility device involving the use of one hand (see 1.00C6e(ii)).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.16.

As an initial matter, Ms. Olson's characterization of the ALJ's reasoning is an oversimplification. The ALJ found several independent reasons to find that Ms. Olson did not meet Listing 1.16.

Specifically, the ALJ found that "none of the claimant's own medical sources has indicated clinical findings on physical examinations or results of diagnostic laboratory testing that would satisfy the severity requirements of any listed impairment." (Tr. 26.) The ALJ went on to state as follows:

> [N]either the claimant's skeletal spinal disorders nor fibromyalgia has met the shared functional limitation (D) element of Listing[] . . . 1.16 . . . because these impairments have not caused for a continuous period of at least 12 months a "documented medical need for" a walker, or a documented medical need for a one-handed handheld assistive device (such as a cane) and evidence showing an extreme limitation in ("inability to use") one upper extremity to independently initiate, sustain, and complete work-related activities involving fine and gross movements, or an inability to use both upper extremities to independently initiate, sustain, and complete work-related activities involving fine and gross movements. . . .

(Tr. 26.)

The ALJ found that Ms. Olson started using a cane in June 2023 and a rolling walker in September or October 2023, "thus well short of the minimum 12-month continuous period needed to meet . . . the . . . criteria. (Tr. 27.)

The ALJ went on to provide an additional reason for his conclusion:

> Moreover, the reason that the claimant had started to use the cane and then the walker, on her own volition and notably inconsistent with her assertion

in January 2024 hearing testimony that her physician had prescribed both of these assistive devices (but not itself a required factor for the listings), was new-onset and intermittent numbness in her right foot, but any connection between this symptom and the claimant's musculoskeletal disorder of the lumbar spine was ruled out objectively by electromyography (EMG) study, by no concerning abnormality(s) shown on August 2023 MRI of the lumbar spine, and by a November 2023 neurological evaluation similarly finding no clear medical etiology for the right foot numbness.

(Tr. 27.)

These findings are well supported by the record. First, while Ms. Olson is correct that the records reflect that she began using a cane and then moved to a rollator in 2023, the ALJ is correct that Ms. Olson described that she began relying on these devices based on right-foot numbness, which had caused several falls. (Tr. 905.) The ALJ is also correct that this numbness could not be medically attributed to any alleged stenosis, as electromyography testing was normal. (Tr. 870.)

Second, the ALJ is correct that there is no *documented medical need* for such an assistive device. *See* 20 C.F.R. Pt. 404, Subpart P, App'x 1, § 1.00.C.6.a ("When we use the phrase 'documented medical need,' we mean that there is evidence from a medical source that supports your medical need for an assistive device . . . for a continuous period of at least 12 months . . . . This evidence must describe any limitation(s) in your upper or lower extremity functioning and the circumstances for which you need to use the assistive device.").

Here, while Ms. Olson testified that her cane and rollator had been prescribed, she can point only to—at best—Dr. Turgeon's medical source statement from December 2023 stating that Ms. Olson required a cane or other hand-held assistive device for both standing and walking. (Tr. 1128.) Even this statement, though, does not describe how Ms. Olson walks with these devices— *see* 20 C.F.R. Pt. 404, Subpart P, App'x 1, § 1.00.C.6.d ("If you use a hand-held assistive device, we need evidence from a medical source describing how you walk with the device.")—or identify the circumstances in which the device is needed. *C.f.* SSR 96-9p, 1996 WL 374185, *7 (July 2,

1996) ("To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed . . . . [I]f a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded."). The latter point deserves special attention, as Dr. Turgeon specifically opined that such an assistive device is *not* needed all time, without describing those circumstances for which the device is needed.

The Court further is not convinced that the 2023 MRI imaging clearly reflects compromise of the cauda equina. The MRI was largely unremarkable; it revealed *mild* tortuosity of the cauda equina nerve roots at L5–S1 with *slight* peripheralization. (Tr. 925.) It would be difficult to find that the ALJ erred in interpreting these records, especially where Ms. Olson spoke with a neurosurgeon who told her that there was "nothing concerning" on the MRI. (Tr. 870.)

Finally, the Court has considered Ms. Olson's argument that her progression from a cane to a rollator reflects a significant deterioration such that it would be reasonable to conclude that any functional limitation would be expected to last longer than 12 months. The Court is again not convinced. As discussed above, the etiology of Ms. Olson's intermittent numbness has not been determined. Moreover, it was Ms. Olson's burden at Step Three to "present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004). Her testimony regarding her need for a cane, and then a walker does not meet that burden even considering the medical records reflecting an observation that she used those devices and medical imaging reflecting some abnormal findings.

28

The extent of the ALJ's reasoning as to Listing 1.16 distinguishes this case from the cases Ms. Olson cited in support of her position. *See Harris v. Comm'r of Soc. Sec.*, No. 1:18-cv-1984, 2019 WL 4991641, *9 (N.D. Ohio Oct. 8, 2019) (no analysis of the evidence compared to the Listing); *Bryson v. Comm'r of Soc. Sec.*, No. 1:20cv1137, 2021 WL 2735993, at *12–13 (N.D. Ohio June 10, 2021) (same); *Meyer v. Comm'r of Soc. Sec.*, No. 3:20-cv-921, 2021 WL 1224063, at *9–10 (N.D. Ohio Apr. 1, 2021) (highly selective review of the evidence, including characterizing two lumbar surgeries and the implantation of a spinal cord stimulator to be "conservative treatment").

In conclusion, the Court finds no reversible error in the ALJ's reasoning or conclusion that Ms. Olson did not meet or medically equal Listing 1.16. *Secrest v. Comm'r of Soc. Sec.*, Case No. 5:23-CV-1228, 2024 WL 3030307 (N.D. Ohio May 29, 2024).

Accordingly, Ms. Olson's first assignment of error is overruled.

### 2.   *Second Assignment of Error – Listing 11.02B*

In her second assignment of error, Ms. Olson argues that the ALJ erred at Step Three by failing to adequately consider whether Ms. Olson's migraine headaches medically equaled Listing 11.02B. She points out that she was prescribed sumatriptan succinate during a November 2023 appointment to be taken once a day as needed for her headaches. (Tr. 1051). She further points to her testimony, including that she had migraine headaches about twice a week. (Tr. 86). Next, she points to Dr. Turgeon's medical source statement indicating that Ms. Olson's migraine headaches occurred two times per week with associated symptoms including vertigo, nausea, malaise, photophobia, and phonophobia. (Tr. 1118–21.)

The Commissioner defends the ALJ's conclusion that Ms. Olson failed to meet her burden to show that she medically equaled the listing and his reasoning that no acceptable medical source established that she had headaches at the requisite frequency despite adherence to treatment.

The Social Security Agency has promulgated SSR 19-4p to "explain [Agency] policy on how we establish that a person has a[] [medically determinable impairment] of a primary headache disorder and how we evaluate primary headache disorders in disability claims." SSR 19-4p, 2019 WL 4169635, at *2 (Aug. 26, 2019). The regulations require that the "[medically determinable impairment] be established by objective medical evidence from an acceptable medical source." *Id*. (footnotes omitted).

SSR 19-4p states in relevant part:

> Primary headache disorder is not a listed impairment in the Listing of Impairments (listings);[] however, we may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing.[]
>
> Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing.
>
> Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

SSR 19-4p, 2019 WL 4169635 at *7.

The ALJ addressed Listing 11.02B as follows:

> [N]o medically equivalent severity to the specified frequencies and durations of migraines set forth in Listings 11.02B and 11.02D can be supported in this case because the allegedly frequent migraines have not occurred "despite adherence to prescribed treatment," which is a required element of that listing and is defined in section 11.00C of Appendix 1 as taking medication(s) and following other treatment procedures as prescribed by a physician for three consecutive months (at least). . . . [T]hrough the September 2021 date last insured, there is no evidence of migraines approaching the required frequencies of these two listing subparts at once per month or at once every two months. Such remained the case throughout year 2022 of primary care office notes from Dr. Elizabeth Prosser and, starting in December, Nicholas Turgeon, D.O. . . . Second, reports of migraines at a once-monthly to even daily frequency in February–March 2023 follow-ups in primary care do not occur in the required setting of adherence to prescribed treatment, as the claimant had stopped taking daily preventative medication Depakote during this period, which was connected with the express worsening of her migraines . . . . Dr. Turgeon initiated alternative migraine-preventative therapy via monthly Aimovig injections at the March 2023 follow-up, and the next follow-up in May makes no mention of refractory or residual migraines or other headaches . . . . Thus, the migraines have at times not occurred despite adherence to prescribed treatment or they have not been medically documented to have occurred at the required frequencies, and they cannot be found to be medically equivalent in severity to the neurological disorders listings for dyscognitive seizures.

(Tr. 27–28.)

After careful consideration, the Court finds the ALJ's conclusion and reasoning to be materially accurate and supported by substantial evidence.

Here, Ms. Olson's argument that the ALJ's recitation of the record evidence was somehow materially inaccurate is not well-taken. She points out that she was prescribed sumatriptan succinate at her November 2023 appointment, but she neglects to mention that this was merely a refill. (Tr. 1051). Indeed, Dr. Turgeon identified that Ms. Olson's migraine headaches were not intractable, and there is no further mention of migraine headache complaints in the appointment

note. (*See* Tr. 1051–53.) Far from contradicting the ALJ's summary of the evidence, then, the appointment note supports it.

It is true that Dr. Turgeon, despite not specifically discussing migraine headaches in this note, went on to complete a medical source statement in December 2023 indicating that Ms. Olson continued to experience migraine headaches two times per week with associated symptoms including vertigo, nausea, malaise, photophobia, and phonophobia. (Tr. 1118–21.)

But as discussed further above, the standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

Here, the ALJ relied accurately on records indicating that Ms. Olson's migraine headaches had gotten worse beginning in March 2023 after she voluntarily discontinued her migraine medicine. He stated accurately that the medical records after her medication was changed do not clearly reflect continued migraine activity at the required frequency (specifically, at least once per week for at least three consecutive months). And neither of the state agency reviewing physicians found that Ms. Olson met or medically equaled any listing, which provides additional support for the ALJ's determination. *See Weese v. Comm'r of Soc. Sec.*, Case No. 1:22-CV-2215, 2024 WL 4213314, at *23 (N.D. Ohio Sept. 17, 2024).

Put another way, Ms. Olson has not identified any evidence from an acceptable medical source establishing that she experienced migraines at least once per week for three consecutive months as SSR 19-4p requires. *See* SSR 19-4p, 2019 WL 4169625, at *7 (requiring "a detailed description from an [acceptable medical source] of a typical headache event, including...the frequency of headache events").

Before concluding, the Court addresses another argument Ms. Olson made in a cursory way in her brief. She argues that the ALJ erred when crafting the RFC because he did not specifically consider any effects the headaches would have on her ability to engage in substantial gainful activity on a full-time and sustained basis. The argument is not accurate.

As an initial matter, an ALJ's decision must be read as a whole and with common sense. *E.g.*, *Hollinger v. Comm'r of Soc. Sec.*, Case No. 1:23-CV-00418-BYP, 2024 WL 310715*9 (N.D. Ohio Jan. 11, 2024). Here, the ALJ discussed the evidence relevant to Ms. Olson's headaches at several points in the decision. (*E.g.*, Tr. 25–26, 27–28, 31, 39, 40.) He acknowledged Ms. Olson's testimony about the functional limitations and frequency of her migraines but ultimately concluded that her statements were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 39.) But here, the ALJ specifically set forth—when crafting the RFC—that he found that Ms. Olson's description of two weekly migraines was "not supported by the lack of mentioned migraines since March 2023 initiation of Aimovig in the primary care setting or with any pursuit of alternative rescue medication in light of the reported side effects." (Tr. 40–41.) He wrote that her migraines "would only limit the claimant's work-related functioning by restricting her from ever safely climbing ladders, ropes, or scaffolds and from being exposed to hazards of unprotected heights, hazardous machinery, and commercial driving." (Tr. 41.)

The ALJ did not err in concluding that Ms. Rossi failed to demonstrate that she medically equaled Listing 11.02B, and he adequately explained his consideration of migraine headaches when crafting the RFC.

Therefore, Ms. Olson's second assignment of error is overruled.

### 3.    *Third Assignment of Error – Medical Source Statements*

In her third assignment of error, Ms. Olson contends that the ALJ erred by failing to address consistency when evaluating Dr. Turgeon's medical source statements and a mental impairment questionnaire completed by Mr. Parsons. She argues that the ALJ's finding that these statements were not persuasive was not supported by sufficient evidence. She relies heavily on the medical source statements themselves, and she points out other areas in the record documenting instances where Ms. Olson complained of debilitating pain, the MRI imaging showing certain abnormalities, and mental-health records reflecting consistent mental-health symptoms.

The Commissioner defends the ALJ's evaluation of these source statements as a reasoned consideration of the record evidence that took into account both supportability and consistency.

The Court agrees.

Social Security Ruling ("SSR") 98-6p provides that "[i]f the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted." 1996 WL 374184, at *7 (July 2, 1996).

Agency regulations state that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).

 Instead, the SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of

34

the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id.*

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. See 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 404.1520c(c)(2).

"As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022). That is the case here.

In finding Dr. Turgeon's opinions to be not persuasive, the ALJ stated as follows:

> Dr. Turgeon's medical opinions are not persuasive for a variety of reasons.
>
> First, conflicting with the representative's assertion that he has seen the claimant more than 20 times since the October 2019 alleged onset date in these applications, Dr. Turgeon had not actually examined or treated any of the claimant's health issues until December 2022—in noticed transfer of primary care from Dr. Elizabeth Prosser, whose 2019, 2020, 2021, and even 2022 office notes are largely unremarkable and silent about much of the 2023 diagnoses cited in his opinions as causing extreme exertional limitations and inabilities to sustain work due to migraines alone. Regardless of him possibly having seen the claimant back in 2015, as stated, this initial factor does undermine overall supportability of his opinions in light of a much more recent (12-month) period of actually examining and treating the claimant's physical impairments in the relevant timeframe . . . .

Second, compounding further supportability directly cited in his opinions, Dr. Turgeon checked-off 14 of 15 migraine-associated symptoms (only not checking impaired appetite), stated that these occur twice per week and last for eight hours, and are worsened by bright lights, noise, stress, movement, and weather changes . . . . These are not shown in his 2023 office notes, nor was any clinically observed signs of migraines on his examinations (e.g., tremors, apparent distress/pain, sweating, etc.). Although his citation to sumatriptan causing "debilitating" dizziness has some corresponding report to his March 2023 office note, it still bears repeating that he maintained her on that migraine rescue medication until a different medical source, Dr. Ryan Drake in neurology specialty, substituted Maxalt in late November 2023. Moreover, the midyear 2023 follow-up note does not support any continuance of migraines at this frequency and duration.

Continuing, Dr. Turgeon's own 2023 office notes fail to show his purported objective signs of abdominal tenderness, weakness in any extremity, limited cervical spinal range of motion, and other side effects of drowsiness and nausea from unspecified medications . . . . Instead, in addition to showing normal gait, his 2023 office notes through November 21, 2023 show normal range of motion of the spine and otherwise full musculoskeletal range of motion, and no abdominal tenderness ("NT") or other abnormality . . . .

Without much of any accurate objective medical support from his own office notes and included physical examinations of the claimant, Dr. Turgeon's opinions appear to rely on current subjective reports from the claimant, which might have been embellished, per a noticeable report made in May 2023 that the MRI of the cervical spine revealed its status as likened to that "of an 80[-year-old]" . . . . He did not cite to any specific evidentiary support based on his review of other medical sources' records. Although his later 2023 office notes do suggest some reduced standing and walking ability and do show the dually reported and observed use of a cane and then the reported use of a walker, his opinion failed to account for the fact that these relate to a recent onset symptom of periodic numbness in the right foot and that testing by other medical sources has not shown any connection to the lumbar spinal abnormality at L5-S1 or to any neurological disorder (per negative EMG of the lower extremity(s)), and thus his records do not support the full extent of limitation insofar as less than two total hours of standing and walking capacity in an eight-hour period.

Compounding these multiple defects in supportability of his opinions regarding migraines and other physical health conditions, the 2023 medical evidence from the claimant's other medical sources is no more than partially consistent with Dr. Turgeon's assignment of some standing and walking limitations and need for a handheld assistive device to support walking. As noted above, albeit in the setting of mental health counseling, the claimant

36

was routinely observed to appear slightly unsteady on her feet; and Dr. Drake noted give-way weakness on the right leg in late November 2023 neurology consult. But the host of other assigned general (sustainability) work-related limitations due to migraines, neck and other chronic pain, and bowel symptoms from pancreatic insufficiency are not consistent with the other medical sources' records, which reflect prompt improvement in diarrhea and in objective findings on repeat upper GI endoscopy with taking a daily digestive enzyme (Zenpep), the negative EMG study and mostly unremarkable MRI findings at the lumbar spine, partial improvement in neck and shoulder pain through a two-month course of formal physical therapy in early 2023, and limited advancing treatments pursued for addressing pain beyond one epidural steroid injection and taking oral medications, but per testimony now only taking Tylenol.

(Tr. 51–52.)

In discussing Mr. Parsons's opinion, the ALJ wrote the following:

The December 2023 medical opinion from N.P. Parsons remains not persuasive for the Title XVI period because its cited support is largely inapposite [the] his predominantly unremarkable and no more than mild to moderate subjectively endorsed anxiety and depressive symptoms across 2022 and 2023 routine psychiatric follow-up notes. In example, nothing within those notes suggests poor focus and concentration or outright distractibility either as clinically observed by N.P. Parsons or as endorsed by the claimant, and instead only when she was temporarily not taking Vyvanse for part of 2023 does there appear an observation of short attention span. Likewise, significant and essentially medication-uncontrolled anxiety cited in the opinion is also not supported with his progress notes over this timeframe, as the claimant has repeatedly reported effectiveness of as-needed use of Xanax medication, with no change made over the past two years as an additional factor incongruent with most of the opined limitations in specific mental work activities and expected rate of absenteeism. Major depressive disorder, while concurrently noted as severe in the same month's follow-up pertaining to ongoing bereavement of her deceased sister a few months earlier, has otherwise been better managed over the majority of 2022 on Trintellix and then Cymbalta. Complicating these various areas of weak supportability shown from his own relevant progress notes, N.P. Parsons's opinion is also not consistent with the collateral medical evidence over 2022–2023 from the claimant's Coleman counselors, which fail to show seriously limited social interactional abilities with others or any maintaining focus and attention for the duration of the individual and later added group therapy sessions.

(Tr. 53.)

While Ms. Olson frames her assignment of error around consistency, the substance of her argument is merely that the ALJ's evaluation of these opinions was not supported by substantial evidence. She does not actually argue that the ALJ utterly failed to address consistency, and no such argument would be persuasive in any event.

The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. See 20 C.F.R. § 404.1520c(c)(2). Here, with respect to both of Ms. Olson's treating professionals, the ALJ discussed the various ways in which their stated opinions were inconsistent with other medical and nonmedical sources in the record.

Considering the ALJ's decision as a whole, the Court finds that the ALJ accurately addressed both the supportability and consistency of Dr. Turgeon's opinions, and that his conclusions in that regard are supported by substantial evidence.

Turning to Ms. Olson's substantial-evidence argument, the argument strenuously sets forth the position that Dr. Turgeon's and Mr. Parsons's opinions were in fact supported and consistent with other evidence in the record. After careful consideration, the Court does not find reversible error in the ALJ's conclusions. A reviewing court may not "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (*quoting Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

"The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial

evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

The ALJ's careful and thorough discussion of supportability and consistency set forth above is materially accurate. The ALJ carefully considered the record here, including the records that Ms. Olson relies upon as supporting her desired limitations.

While the ALJ did not come to Ms. Olson's preferred conclusion, the court is convinced that this is a case falling within that "zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (*quoting Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

Accordingly, Ms. Olson's third assignment of error is overruled.

### 4.    *Fourth Assignment of Error – Step Five*

In her final assignment of error, Ms. Olson briefly contends that the ALJ misconstrued the vocational expert's hearing testimony. She points out that the ALJ concluded that Ms. Olson, even if she required the use of a rollator, could nevertheless perform the work of a "document preparer" (DOT 249.587-018), "surveillance system monitor" (DOT 379.367-010), or "addresser" (DOT 209.587-010). (Tr. 56–57.) She says that the VE's testimony does not support that those jobs would be available to someone with Ms. Olson's RFC.

The Commissioner defends the ALJ's decision as adequately supported by the VE's testimony. The Commissioner is again correct.

As discussed further above, the VE testified that a hypothetical individual capable of performing sedentary work with certain exertional and non-exertional limitations (matching the RFC with the exception of the rollator requirement) could perform the work of a document preparer (as actually performed), assembler, or sorter. (Tr. 100–01.)

The ALJ next asked the VE to further limit the hypothetical person such the person would need to use a rollator. (Tr. 101.) The VE then testified that she would eliminate the work of the assembler and the sorter for such a person (i.e., leaving document preparer). (*Id.*) The VE specifically testified that such a person could perform different work, though—that of a surveillance-system monitor (DOT 379.367.010) or an addresser (DOT 209.587-018). (Tr. 101–02.)

These three jobs—document preparer, surveillance-system monitor, and addresser—were ultimately those relied upon at Step Five at the sequential analysis. In other words, the ALJ's conclusions in this regard are perfectly consistent with the VE's hearing testimony. Ms. Olson's argument to the contrary—as the Commissioner suggests—seems to have resulted from a misreading of the transcript.

Ms. Olson's final assignment of error is overruled.[5]

## VI.    CONCLUSION

Having overruled Ms. Olson's assignments of error for the reasons set forth above, the Court AFFIRMS the Commissioner's final decision.

Dated:  <u>January 26, 2026</u>                              <u>/s Jennifer Dowdell Armstrong</u>
                                                                                Jennifer Dowdell Armstrong
                                                                                U.S. Magistrate Judge

---

[5] The jobs the ALJ relied upon in his decision are listed among those in the SSA's Emergency Message 24027. Emergency Messages, EM-24027, SOCIAL SECURITY ADMINISTRATION, https://secure.ssa.gov/apps10/reference.nsf/links/01062025092030AM (last accessed January 23, 2026). Ms. Olson raises no argument in this appeal that the ALJ failed to comply with EM-24027.